## GUTOWSKY v. JONES et al.
### No. 3890.

United States Court of Appeals
Tenth Circuit.

Nov. 1, 1949.

Rehearing Denied Dec. 19, 1949.

Paul Brown, Oklahoma City, Okl., for appellant.

C. R. Nixon and F. C. Swindell, Tulsa, Okl. (Logan Stephenson Tulsa, Okl., on the brief), for appellees.

Before PHILLIPS, Chief Judge, and BRATTON and HUXMAN, Circuit Judges.

HUXMAN, Circuit Judge.

In 1942, A. (Ace) Gutowsky had acquired oil and gas leases on approximately 8000 acres of land in what is now known as the West Edmond Oil Field in Oklahoma. The consideration for these leases, at least in part, required Gutowsky to drill a well on the acreage by a certain time. Shortly before the expiration time for the commencement of drilling operations, he staked a location and erected a rig on one of the leases. Gutowsky was without funds. He entered into an agreement with D. D. Bourland whereby they were to work together in raising the funds in consideration for which Bourland was to receive an interest in the

leases. Through Bourland, Gutowsky met William M. Jones and O. E. King, two financially substantial citizens of Indiana. After some efforts, Gutowsky succeeded in interesting Jones and King in the venture and they agreed to subscribe $5,000.00 each, and assist in raising the balance of $40,000.-00 needed to drill the well. On October 20, 1942, the written agreement set out in footnote one [1] was drawn up. Considerable time and effort were expended by Bourland and Gutowsky in attempting to secure additional subscriptions to the contract from those whose names were furnished by Jones and King. Jones and King accompanied Gutowsky and Bourland on some of these trips. No other subscriptions to the contract were, however, obtained.

During the time involved Gutowsky and Bourland contacted W. J. Fox and Herbert J. Schmidt of Chicago, and after some negotiations, executed a contract with them in which Fox and Schmidt agreed to advance $24,000.00 toward the drilling of the well. Gutowsky raised the balance of $16,000.00 from other sources and drilled the well. The well was a big producer and the acreage became very valuable.

Thereafter, Jones and King instituted this action against Gutowsky in the District Court of the United States for the Western District of Oklahoma for damages for breach of contract and for an accounting.

Count one of the complaint alleged in substance that on or about the 20th day of

1. "This agreement, entered into this 20 day of October, 1942, by and getween, Mr. A. (Ace) Gutowsky of Oklahoma City, Oklahoma, Party of the First Part and the other signers of this Agreement, Parties of the Second Part: Witnesseth:

"Party of the First Part represents and says that he is the owner of Eight Thousand Acres (8000 acres) of Oil Leases in Oklahoma and Canadian Counties, Oklahoma. He further says that he has an Oil Well Derrick erected on the S.W. 1/4 of Section 32, Township 14 North, Range 4 West, Oklahoma County, a part of said 8000 acres and that he, First Party has entered into a contract with the Kerlin Oil Co. of Oklahoma to Drill a well on the above location to a depth of 7500 feet as soon as he can raise the money to pay for the same.

"In order to raise the money to Drill said well First Party proposes to sell and asign to Parties of the Second Part Two Thousand Acres (2000 acres) of said 8000 acres of Oil Leases and a one fourth interest in all Oil produced on the above described 160 acres where derrick is located, for the sum of Forty Thousand Dollars ($40000.00) Said $40000.00 to be raised and used as follows:

"Parties of the Second Part agree to pay in cash the amount subscribed here to by each Party and recorded opposite his name; when the sum total of such subscriptions shall amount to the said $40000.00.

"Parties of both Parts, Mutualy agree that the money so raised, shall be placed in escro in the Marion National Bank, of Marion Indiana to be paid to said Drilling Co. when the well is completed to the depth of 7500 feet.

"Party of First Part also agrees to allow Parties of Second Part to pick their 2000 acres of leases from the 8000 acres by picking Checker Board fashion, 160 acres, or more, leases from the 8000 acres; one of said 160 acres shall 'off set' the 160 acre lease where the well is located.

"Party of the First Part also agrees to properly and legaly transfer and assign the said 2000 acres of leases and the one fourth interest of all the oil produced on the 160 acre lease described above in section 32, to Second Parties as soon as the money is placed in Marion National Bank of Marion, Indiana.

"It is understood and agreed by all Parties of the Second Part that each of them is to benefit in Dividends, Incomes and Royalties from said 2000 acres of leases and the one fourth interest in Oil in proportion to the amount their subscription and payment bears to the total amount subscribed here to. It is further agreed by Parties of the Second Part that upon the completion of raiseing the said $40000.00 that they will meet and elect persons from their group to further carry on the business of this agreement.

"Party of the First Part:
"Party of Second Part:

Filed October 9, 1945."

| "Signed | Amount |
| --- | --- |
| A. Gutowsky | |
| Wm. M. Jones | $5,000.00 |
| O. C. King | $5,000.00 |

October, 1942, D. D. Bourland, acting as agent of the defendant Gutowsky, introduced the plaintiffs to Gutowsky; that on October 20, 1942, the plaintiffs and Gutowsky entered into a written contract attached to the petition as "Exhibit A"; [2] that at the time of the execution of the contract, Gutowsky represented that he was the owner of 8000 acres of leases in what may be referred to as the West Edmond Oil Field. The complaint further alleged that he breached this contract in the following respects: That W. J. Fox and Herbert J. Schmidt entered into a written contract with Gutowsky to contribute "the balance of said money, the exact amount of which was unknown to these plaintiffs"; that thereafter Gutowsky informed plaintiffs that he was not going to perform his contract with them, "herein denominated Exhibit A"; that they were at all times ready, willing and able to perform their part of the contract and were ready to pay the sum of $5,000.00 each, subscribed by them for their one-fourth interest in the 8000 acres of leases and for the one-fourth interest in the 160 acres on which the well was to be drilled; that by reason of such breach they were damaged in the sum of one million dollars for which they asked judgment.

In a second count, they alleged that on or about October 20, 1942, they entered into an oral contract with Gutowsky in which Gutowsky promised that if they would introduce him and assist him in inducing others to contribute to the venture he would give them the "equivalent of one-fourth of the amount set forth in Exhibit A, $10,000.00. That is to say, that out of the 8,000 acre leases and the 160 acre lease on which the derrick was located, the said defendant would either pay the plaintiffs $10,000.00 for their services by assisting the defendant in raising said money, or would give plaintiffs 500 acres in leases and one-sixteenth interest in the 160 acre leases in the Southwest Quarter (SW ¼) of Section 32, hereinabove described"; that they accepted his offer; that they introduced the defendant to W. J. Fox and induced Fox to become interested in defendant's venture; and that they performed the services required of them and that defendant breached his contract with them. They alleged further that they had the option to take either the $10,000.00 or to select 500 acres of leases and a one-fourth interest in the 160 acre lease on which the well was drilled. They did not, however, elect either of the options, but prayed for an additional one million dollars damages.

The case was tried to the court. It held that Bourland was a necessary party. An amended complaint was thereupon filed making Bourland a party defendant. The case was tried on this amended complaint. In count one of the amended complaint, plaintiffs departed entirely from count one of the original complaint. They abandoned the written contract on which they sued therein, and now alleged that shortly prior to October 20, 1942, an oral contract was entered into in which plaintiffs agreed to contribute $10,000.00 of the necessary $40,000.00, and to share proportionately with others contributing the balance thereof in an undivided one-fourth interest in the 8000 acres of leases; that thereafter Gutowsky and Bourland asked plaintiffs for a memorandum in writing to show to prospective contributors showing that plaintiffs were contributing $5,000.00 each; that thereafter the memorandum agreement (Exhibit A of the original complaint) was executed October 20, 1942, but that said agreement was merely a prospectus to show to other contributors. The alleged oral agreement set out precisely the same terms and considerations as were set out in the written contract, now denominated a prospectus as to the interest of the subscribers of the $40,000.00 in the block of leases. Count one of the amended complaint also set out the same breach by the defendants as alleged in count one of the original complaint. It contained the additional allegations that at the time of the alleged breach by the defendants, plaintiffs had approximately $28,500.00 promised them by contributors. The prayer of amended count one was that plaintiffs be declared to be the joint owners of an undivided one-fourth interest in the

---

2. This is the contract set out in Footnote 1.

total acreage and that defendants be held as trustees, and for an accounting.

Count two of the amended complaint also departed materially from the allegations of count two of the original complaint. It likewise alleged a second oral agreement under which they were to receive an additional interest for their services in aiding the defendants in raising the balance of $40,000.00. Instead of the $10,000.00 or 500 acres of leases which they alleged in the original complaint they were entitled to receive, they now alleged that they were to receive an additional one-sixteenth interest in the entire block and that their one-sixteenth interest in the discovery well was to be free and clear of costs to them. The prayer was that they be decreed to be the owners of the undivided interest in the entire acreage. In a third count, they asked for an accounting.

The trial court held that the written contract (Exhibit A) was not the contract of the parties; that it was only a prospectus; and that the contracts between the parties were the oral contracts set out in counts one and two of the amended complaint. The court held that the Statute of Frauds barred recovery on each of these contracts, but since the plaintiffs had performed their part of the contracts they were entitled to recover on quantum meruit for the reasonable value of their services. It permitted plaintiffs to introduce evidence as to the value of such services and found the value thereof to be one-fourth of the profits made by Gutowsky and Bourland. After Bourland was made a party to the litigation, it was ascertained that the Statute of Limitations had run as to him. He was therefore dismissed from the case and no judgment was rendered against him, and the entire judgment was rendered against Gutowsky. An accounting was ordered which was stayed pending this appeal.

The parties are not in agreement whether the original contract between Gutowsky and Jones and King was a written contract or an oral contract. Apparently appellees were not certain in their own minds about this matter. In the original complaint, they sued upon the written contract. They alleged: "That on the 20th day of October, 1942 the plaintiffs and the defendant executed a written contract, a copy of which is attached hereto, marked 'Exhibit A' and made a part hereof the same as if set forth in full herein," and, "That the said defendant breached said contract as follows" When they filed the amended complaint, whatever doubt they may have had as to the character of the contract seems to have been dispelled because they now abandoned all reference to a written contract and alleged that their contract with Gutowsky was oral. But since we have reached the conclusion that appellees did not perform their part of either the written or oral contracts, it is not necessary to resolve this dispute. For the purpose of this opinion, we will therefore, assume that the alleged two oral contracts constituted the agreements of the parties. It is conceded that these oral contracts were void because they violated the Oklahoma Statute of Frauds, 15 U.S. 1941 § 136, which requires that all contracts concerning an interest in real estate must be in writing to be enforceable.[3]

It is the general law that although a contract may be void and unenforceable because within the Statute of Frauds, yet, if one party thereto has performed, he may recover in an action of quantum meruit the reasonable value of his services. This is also the law of Oklahoma.[4] It follows, therefore, that if, in reliance upon these oral contracts, appellees performed the services required of them, equity will award them the reasonable value of such services.

3. Oklahoma has held that an oil and gas lease conveys an interest in real estate within the Statute of Frauds and must be in writing.

Harris v. Tucker, 147 Okl. 210, 296 P. 397;

Franklin v. Margay Oil Corp., 194 Okl. 519, 153 P.2d 486;

Hall v. Haer, 160 Okl. 118, 16 P.2d 83;

Macsas v. Fishencord, 190 Okl. 407, 124 P.2d 388.

4. Hall v. Haer, 160 Okl. 118, 16 P.2d 83;

Macsas v. Fishencord, 190 Okl. 407, 124 P.2d 388.

While numerous points are urged by the respective parties, the entire matter resolves around the one question of whether the court's finding that appellees performed the services required of them and its finding as to the value of such services are sustained by substantial evidence. While no formal assignment of error challenging the sufficiency of the evidence to support these findings is set out in the appeal, this is the real issue in the case and the point which was argued and presented to us by both parties to the appeal.

■ What were the services required of appellees? While appellees' own testimony is confusing and conflicting, we think from the record they were required to raise and make available to Gutowsky the sum of $40,000.00 to drill the well. This was the consideration for their receipt of 2000 acres of leases and a one-sixteenth interest in the acreage under the well. Thus, Jones testified as follows: "Whose primary duty was it to raise money, yours and King's? A. I presume that would be true, they came to us to get the money." And in the first count of the amended complaint, appellees alleged that after a subscription was obtained from Fox, together with what they had raised, that they would make up the difference, and that they advised Gutowsky that if Fox did not come into the deal at all for him to return and they would personally make up the difference. They also alleged at that time they had approximately $28,500.00 promised to them.

There is not a scintilla of substantial evidence in the entire record that they had raised $28,500.00, or any part thereof, or that they or any other individuals had obligated themselves for one dime. True, they had subscribed $5,000.00 each to the written contract but aside from the fact that they now say that such writing was not a contract but only a prospectus, its terms make it clear that no subscriber was bound until the entire sum of $40,000.00 was subscribed. Neither is there a bit of evidence that anyone had legally obligated himself to contribute anything. Certain of appellees' neighbors were called to testify for the purpose of establishing that they had subscribed money toward this fund. Thus, Ayres testified that he told them he would probably put in $1,000.00 when they got the amount raised. Weinberg testified that he told them he would take $1,000.00. Lohman testified that he thought he told Jones he would take about $2,000.00 Asked if he was ready to make that contribution any time, he replied, "Well I think I was." Scales testified that he was willing to make a contribution only if it took his contribution to make the $40,000.00. Webb testified that he had agreed to subscribe $2,000.00, but when asked why he did not sign the contract, he replied he was like Scales, waiting for them to go ahead with it. None of these men were bound; none had put up any money; none could be compelled to contribute because they had not legally bound themselves to do so. It is also clear that appellees did not consider themselves legally bound to underwrite the $40,000.00, notwithstanding that they testified that it was their part of the agreement to secure the $40,000.00, or underwrite that part thereof not secured by subscriptions. We think it is also clear that they were not willing nor did they intend to put up any money at all. Thus, in count one of the amended complaint, they alleged that they advised Gutowsky to see Fox and have him come in on the deal; that they advised him that after he came in they would make up the difference; that if Fox did not come in at all, Gutowsky was to return to them and they would personally make up the difference. Gutowsky did see Fox and secured a $24,000.00 subscription from him. When he returned and advised appellees of these facts, they knew there was still $16,000.00 needed to make up the total sum. Even assuming that appellees had first called Fox's name to Gutowsky's attention, according to their own testimony they were under duty to furnish the balance needed to make up the $40,000.00. Did they offer or ask for the opportunity to put up the balance of $16,000.00? They did not so testify. There is not a single word of evidence in the entire record of 600 pages that they offered or were willing to put up any part of this $16,000.00, and participate in the venture, and were denied the right to do so.

We think the record warrants the statement that they considered their deal with Gutowsky at an end because of their failure and inability or unwillingness to raise the $40,000.00, and that they did not claim an interest in the project until long after the well came in a producer. Laying aside all their testimony and the testimony of Gutowsky and Bourland, all the disinterested testimony, plus certain written facts and inferences fairly deductible therefrom, compel this conclusion.

After the original well came in, appellec bought interests in three other blocks c acreage which Gutowsky was developing. On July 31, 1943, in writing to Gutowsky concerning one of these ventures, Jones wrote: "I know you are busy and you sure have started a real for sure Oil Boom. How happy I would be to have a little part in it." And in a letter of March 24 to Gutowsky in reference to one of his ventures in which he had an interest, Jones stated: "We know you are doing all you can to make wells on these leases, and if they do not it will be because you *cant* help it. We are glad to be *assiciated* with you even if it is in a small way." And in a letter of November 19, 1944, Jones said to Gutowsky: "But even if I *havent* any of the profit I still like to hear first hand about the success of others." These expressions are not what one would expect from one who felt that he had been wronged by another by repudiation of contractual obligations.

Reverend Garland Howard, Pastor of the Crestwood Baptist Church of Oklahoma City, testified that he had a talk with Jones in the fall of 1944, and asked him if he was interested with Gutowsky in the West Edmond Oil Field, and that Jones replied: "I am not, I wish I was."

Claude Jones, no relation of appellee Jones, testified that in the fall of 1944, he had a conversation with Jones, in which Jones stated that he might have had an interest in this West Edmond Field if he had put up the money.

J. F. Hicks, a Rig Building Contractor, testified that he met Jones and King in Gutowsky's office and had a conversation with them in which he asked them if they could not have been in on this deal, to which Jones replied: "We had our chances to be in on it, but it is just one of those things which *taken* a lot of money and the play wasn't favorable at the time." Jones stated further that: "It turned out all right, but we didn't know enough about the oil business * * *, We hadn't the experience. We have it now."

■ This was an action in which appellees sought to recover under equitable principles the quantum meruit value of services performed. Both under Rule 52(a) of the Rules of Civil Procedure, and well established equitable principles, we are not bound by the trial court's findings if we are of the view that they are against the great weight of the evidence.[5]

■ A consideration of the entire record compels the conclusion that the court's findings are against the great weight of the evidence and that there is no substantial evidence supporting such findings.

The judgment is accordingly reversed and the cause is remanded with directions to enter judgment for the defendant below.

5. Rule 52(a), Rules of Civil Procedure, 28 U.S.C.A.;

Standard Oil Company of Colorado v. Standard Oil Company, 10 Cir., 72 F.2d 524, 527;
United States v. Sands, 10 Cir., 94 F.2d 156, 161.